# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SONJA STANKOSKI,

        **Plaintiff,**

vs.

                                    **Civil Action 2:11-cv-00627**
                                    **Judge James L. Graham**
                                    **Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff,  Sonja Stankoski, filed this action seeking review of a final decision of the

Commissioner of Social Security  ("Commissioner") denying her application for social security

disability insurance benefits.  In her application, which she filed on April 30, 2007, Plaintiff

alleges that she has been disabled since November 3, 2006, due to depression, anxiety, panic

attacks, and joint pain.  (R. at 10, 129–35, 178.)

After initial administrative denials of her claim, Plaintiff appeared and testified at a

video hearing before an Administrative Law Judge ("ALJ") on April 9, 2010.  (R. at 25-58.)

Two medical experts and a vocational expert also testified at the hearing.  (*Id.*)  On May 6, 2010,

the ALJ issued an unfavorable decision denying benefits.  (R. at 10-24.)  This decision became

the final decision of the Commissioner when the Appeals Council denied review on May 24,

2011.  (R. at 1-3.)

In her Statement of Errors, Plaintiff maintains, in part, that the ALJ erred in weighing the

medical evidence; determining that Plaintiff was not entirely credible; and considering the vocational expert testimony.  For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was fifty two years old at the time of the administrative hearing, has four or more years of college education.  (R. at 131, 184.)  Her past relevant work was in medical sales performing the jobs of advertising coordinator, bonus specialist, convention coordinator, executive secretary, human resources coordinator, project coordinator, sales analyst, and secretary.  (R. at 161.)

At the administrative hearing in April 2010, Plaintiff's counsel clarified that Plaintiff was alleging disability due to depression; anxiety; coronary artery disease; lumbar, cervical, and thoracic degenerative disc disease with stenosis; osteoarthritis; and fibromyalgia.  (R. at 28.)

Plaintiff testified that she stopped working on November 3, 2006 because her father passed away and she was diagnosed with major depression.  (R. at 36.)  She felt she could not work because she was unable to concentrate.  (*Id.*)  She noted that she had stopped reading books because she could not focus or remember what she had read.  (R. at 37–38.)  According to Plaintiff, her depression has remained the same since November 2006.  (R. at 37.)  She reported frequent crying spells, but also suggested that the medication she was taking at the time of the hearing kept her from crying everyday.  (*Id.*)  Plaintiff indicated that her depression has caused her to lose touch with her friends.  (R. at 38.)  She stated that she suffers from anxiety which increased after 2006 due to her physical problems.  (R. at 39.)  She noted a few panic attacks.

(*Id.*)  At the time of the hearing, Plaintiff testified that until last year she was going to mental health counseling every week.  (R. at 46.)  Plaintiff, however, had not seen a counselor since her health insurance changed, and had instead received medication from her primary care physician. (*Id.*)  Plaintiff admitted that, although she had insurance, she had not tried to find a psychologist compatible with her plan.  (*Id.*)

Plaintiff testified that she has degenerative discs and arthritis in her spine.  (R. at 40.) Plaintiff stated that she has had back pain for years, but that the pain started to get worse around 2008 when she began developing arthritis.  (R. at 40–41.)  She suggested that she was better able to cope with the pain before her depression.  (R. at 40–41.)  Plaintiff described her pain as constant in her neck and back region.  (R. at 41.)  She rated her pain at a seven on a ten-point pain scale.  (R. at 41-42.)  Plaintiff also testified that she has arthritis in her hands and it is hard to do fine motor tasks. (R. at 40.)  She further testified that her doctor diagnosed her with fibromyalgia in 2007.  (R. at 43.)  She reported that due to her fibromyalgia, she has pain and "hot spots" that cause pain along with fatigue.  (*Id.*) At the time of the hearing, Plaintiff stated that her fibromyalgia pain was also a seven on a ten point pain scale because it was connected to, and hard to distinguish from, her back pain.  (R. at 44.)  Plaintiff noted that her fatigue has been constant since 2008.  (R. at 55.)  Finally, Plaintiff testified to chest pain and shortness of breath. (R. at 56.)  Plaintiff indicated that while her pain medications help with her pain, they also make her drowsy.  (R. at 42-43.)

Plaintiff estimated that she could walk a half a block.  (R. at 42.)  She testified that she could not stand for more than fifteen minutes due to her back pain.  (R. at 41.)   She believed she could sit for approximately 30 minutes before she would need to stand up, stretch, or shift.  (R. at

42.)  Plaintiff testified that she lies down three to four times a day for 30 to 45 minutes at a time.  (*Id.*)  Plaintiff stated that she tries not to lift anything heavier than a gallon of milk.  (R. at 46.)  Plaintiff acknowledged that she drove, but not long distances.  (*Id.*)  She reported going to the grocery store alone, but stated that she will not buy many items unless her husband is there to help her.  (*Id.*)

On an average day, Plaintiff testified that she woke up around 7:00 a.m., but would lie in bed for an hour.  (R. at 44.)  She would typically eat breakfast, talk on the phone, make herself a sandwich for lunch, and lie back down.  (R. at 44–45.)  Plaintiff stated that she was still able to take care of her personal needs.  (R. at 45.)  Plaintiff testified that she is able to fold laundry, but that her husband brings the laundry to her.  (R. at 45.)  She lived in a two story home and spent most of the day on the first floor, but went upstairs to sleep at night.

### III.  MEDICAL RECORDS

**A.     Mental Impairment**

**1.     Dr. Clemente**

Psychiatrist Marc Clemente, M.D., performed an initial evaluation of Plaintiff in April 2007.  (R. at  225-28.)  At that time, Plaintiff reported being "under stress" since the death of her father.  (R. at 225.)  She had not returned to work since October 2006.  (R. at 225.)  Dr. Clemente diagnosed Plaintiff with major depressive disorder, without psychotic features, and prescribed Cymbalta, Wellbutrin, and Remeron.  (R. at 227-28.)  The record reflects that Plaintiff continued to treat with Dr. Clemente through at least November 2007.  (R. at 292-93.)

**2.     Dr. Mancuso**

April Mancuso, Psy.D., began treating Plaintiff in March 2008.  (R. at 567-69.)  Plaintiff

reported that she was suffering from crying spells, sleep apnea, and low energy. (*Id.*) Plaintiff

continued to receive mental health counseling through January 2009. (R. at 552-69.) On March

19, 2009, Dr. Mancuso sent an update to Dr. Clemente. (R. at 553.) Dr. Mancuso reported that

Plaintiff had been coming in regularly about once a month. (*Id.*) Dr. Mancuso noted a decline in

Plaintiff's "emotional functioning clearly tied to her physical cardiac condition." (*Id.*) Dr.

Mancuso further indicated that MMPI-2 and Beck testing showed a level of depression similar to

the prior year. (*Id.*) Dr. Mancuso opined that Plaintiff's anxiety was now moderately severe.

(*Id.*) Dr. Mancuso did note, however, that Plaintiff had been doing much better. (*Id.*) Finally,

Dr. Mancuso commented that Plaintiff's "[t]aking on the role of an invalid makes others around

[her] feel guilty and angry and in turn aggravates [Plaintiff's] stress." (*Id.*)

### 3. Dr. Hart

On July 11, 2007, psychologist, Joanna Hart, Ph.D., reported to the state agency that she

had seen Plaintiff six times for grief counseling following the death of her father in November

2006. (R. at 232.) Dr. Hart reported that "[i]n addition to normal symptoms of grief,

complicated by the suddenness of her father's decline and death, [Plaintiff] has exhibited many

symptoms of depression including sleep disorder, weight gain, depressed mood, obsessive

thinking, self-doubt, difficulty concentrating, fatigue, and difficulty coping." (*Id.*) Dr. Hart felt

that Plaintiff's "ability to cope and make decisions" was considerably compromised. (*Id.*) Dr.

Hart concluded that Plaintiff's "overall functioning had been impaired." (*Id.*) Dr. Hart further

reported that Plaintiff had cried throughout their counseling sessions. (*Id.*)

### 3. Dr. Hammerly

Psychologist Mark Hammerly, Ph.D., evaluated Plaintiff, on behalf of the state agency, in

August 2, 2007.  (R. at 233-40.)    Plaintiff reported depressed mood, general fatigue and loss of

energy, and feelings of worthlessness or excessive or inappropriate guilt nearly every day.  (R. at

238.)  Dr. Hammerly noted that Plaintiff was dysphoric and sometimes tearful during the

examination.  (*Id.*)  He concluded that Plaintiff's condition "probably started out as an

Adjustment Disorder due to a death in the family, but has grown worse over the course of her

illness."  (*Id.*)  Dr.  Hammerly did comment that it was "rather unusual, certainly, for an

American with spousal support to grieve this long, and the phenomenon here is likely influenced

by cultural differences, and the fact that she took care of the man for quite awhile as he was

dying."  (R. at 238.)

Dr. Hammerly diagnosed major depression, single episode, moderate, and assigned

Plaintiff a Global Assessment of Functioning (GAF) score at 51.[1]  (R. at 239.)  Dr. Hammerly

opined that Plaintiff's abilities to relate to others and withstand work stress were moderately

impaired.  (R. at 239-40.)   He determined that Plaintiff's ability to understand, remember, and

follow instructions and her ability to maintain attention, concentration, persistence and pace to

perform simple repetitive tasks were not impaired.  (R. at 240.)

4.      **Dr. Wasserman**

State agency physician Karen Wasserman, Psy.D., offered a reviewing opinion regarding

---

[1]  The GAF scale is used to report a clinician's judgment of an individual's overall level of
functioning. Clinicians select a specific GAF score within the ten-point range by evaluating
whether the individual is functioning at the higher or lower end of the range. *See* American
Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American
Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 51-60 is
indicative of an individual having "moderate symptoms . . . or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
DSM-IV-TR at 34.

Plaintiff's mental residual functional capacity on September 5, 2007.  (R. at 249–52.)  Dr. Wasserman found Plaintiff moderately limited in several areas including the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and the ability to perform tasks within a schedule.  (R. at 249.)  According to Dr. Wasserman, however, there was no evidence of limitation in Plaintiff's ability to remember, understand, and carry out simple instructions.  (*Id.*)  The only category in which Dr. Wasserman found Plaintiff markedly limited was her ability to set realistic goals and make independent plans.  (R. at 250.)

Ultimately, Dr. Wasserman restricted Plaintiff to routine or low-stress tasks.  (R. at 251.) She found Plaintiff's allegations "credible in nature, but not in severity."  (*Id.*)  Alice Chambly, Psy.D., affirmed Dr. Wasserman's opinion in December 2007.  (R. at 300.)

**B**.      **Physical Impairment**

**1.      Dr. Salomon**

 In June 2007, Albert Salomon, D.O., Plaintiff's primary care physician, completed a questionnaire regarding Plaintiff's conditions.  (R. at 230.)  He indicated he first saw Plaintiff in September 1996 and had last seen Plaintiff on May 24, 2007.  (*Id.*)  Dr. Salomon's diagnoses at this time included major depression, low back pain, osteoarthritis, and panic attacks.  (*Id.*)  He included back tenderness within his list of clinical findings.  (*Id.*)  In describing limitations that would impair Plaintiff's ability to work, Dr. Salomon opined that Plaintiff was "unable to concentrate well" and "panics."  (R. at 231.)  Dr. Salomon noted, however, that it was "too early to determine" if Plaintiff's conditions had responded to therapy.  (*Id.*)

Dr. Salomon's treatment records contain various test results.  A myocardial perfusion

imaging scan in December 2006 yielded normal results. (R. at 288.) A September 2007 x-ray of Plaintiff's lumbar spine showed degenerative changes at the L4-5 level, but no acute traumatic abnormalities. (R. at 280.) In October 2007, a cervical spine MRI showed spondylotic protrusion resulting in mild to moderate left foraminal stenosis and effacement of the thecal sac without evidence of cord compression at the C3-C4 level. (R. at 274–75.) The C4-C5 level showed disc desiccation; broad-based bulging disc that effaces the thecal sac without evidence of cord compression; and mild left foraminal stenosis. (*Id.*) At C5-C6 disc height narrowing and disc desiccation; spondylotic protrusion effacing the thecal sac without evidence of cord compression; and mild left foraminal stenosis. (*Id.*) The cervical spine MRI also displayed mild encroachment into the right foraminal entrance. (*Id.*) A lumbar spine MRI, taken the same day, showed multi-level disc dessication and bulging with mild to moderate stenosis at L3-4 and L4-5. (R. at 276.) Finally, in November 2007, a thoracic spine MRI showed "minimal, noncompressive" spondylosis and no evidence of compressive discopathy. (R. at 270.)

In December 2007, Dr. Salomon reported that Plaintiff often cried during visits and was recently diagnosed with severe sleep apnea. (R. at 268.) Dr. Salomon indicated that Plaintiff was 69" tall, with her weight ranging from 231 to 242 pounds over her past three visits. (*Id.*)

Dr. Salomon admitted Plaintiff to the hospital on June 11, 2008 due to multiple complaints including, headache, chest pain, osteoarthritis, depression, and gastroesophageal reflux disease. (R. at 354.) Plaintiff reported having frequent headaches, stating that her head was sensitive to touch and "that it was going to explode." (*Id.*) She further reported that her pain was constant. (*Id.*) An outpatient MRI showed two punctate areas of hyperintensity which the radiologist felt may be a lacunar infarction, but likely migraines. (*Id.*) Plaintiff also

complained of chest discomfort at this time, lasting for 4 to 5 minute intervals. (*Id.*) Dr. Salomon noted that this pain was associated with diaphoresis. (*Id.*) Plaintiff was discharged on June 13, 2008. (*Id.*)

Plaintiff continued to receive treatment from Dr. Salomon from 2008 until at least February 2012. (R. at 536–51.) On July 8, 2008, Dr. Salomon recorded that Plaintiff had eighteen out of eighteen tender points and diagnosed fibromyalgia. (R. at 546.) In October 2009, a CT scan of Plaintiff's lumbar spine showed degenerative changes in the lower lumbar spine, most severe at the L5-S1 level. (R. at 396.) A CT scan of Plaintiff's thoracic spine on that date showed mild degenerative changes. (R. at 397.)

### 2. Dr. Fleishman

Plaintiff was evaluated by Bruce L. Fleishman, M.D., on July 11, 2007, due to atypical chest discomfort on the left side of her chest going up her neck since December 2006. (R. at 285.) Dr. Fleishman recommended an EBCT (electron beam computerized tomography) to assess whether Plaintiff had developed coronary calcifications. (*Id.*)

On July 3, 2008, Dr. Fleishman wrote to Dr. Salomon regarding Plaintiff's treatment. (R. at 574.) Dr. Fleishman indicated that Plaintiff had recently undergone cardiac catheterization due to chest discomfort, shortness of breath, and diaphoresis. (*Id.*) The catheterization revealed "some diffuse mild disease but she did have an 85% lesion in a marginal branch of the circumflex." (*Id.*) Dr. Fleishman placed a stent across Plaintiff's lesion "with excellent results." (*Id.*)

Dr. Fleishman saw Plaintiff for routine follow up on October 28, 2008. (R. at 573.) He reported that Plaintiff had been doing well without any chest pain, shortness of breath, PND

(paroxysmal nocturnal dyspnea), orthopnea, or peripheral edema.  (*Id.*)  Plaintiff noted some nonspecific noncardiac pains, but Dr. Fleishman did not feel these were related to her heart.  (*Id.*)

In March 2009, Plaintiff underwent another cardiac catheterization, which showed a new mid left anterior descending lesion where there was only a previous 10-15% disease.  (R. at 572.)  Dr. Fleishman placed a drug eluting stent and switched her medication.  (*Id.*)  Following this procedure, Plaintiff reported "feeling lousy" and continued to note chest pain, burning, shortness of breath, and fatigue.  (R. at 571.)  Dr. Fleishman noted that Plaintiff "actually looks great" and that her physical examination was "unremarkable."  (*Id.*)

### 3.  Dr. Grodner

Herbert Grodner, M.D., examined Plaintiff on August 16, 2007, on behalf of the state agency.  (R. at 241-43.)  Upon examination, Plaintiff had a slow deliberate gait and complained of back and knee pain when squatting.  (R. at 242.)  Plaintiff had normal strength and reflexes and was able to grasp and manipulate in each hand without difficulty.  (*Id.*)  She had a mildly decreased range of motion in her lumbar spine but there was no evidence of radiculopathy and straight leg raising was negative.  (R. at 243.)  Dr. Grodner noted some tenderness to palpation.  (*Id.*)  Dr. Grodner also found some pain over the thenar prominence bilaterally.  (*Id.*)  Plaintiff had tender points to digital palpation.  (*Id.*)  Dr. Grodner acknowledged that Plaintiff was previously diagnosed with fibromyalgia and degenerative joint disease.  (*Id.*)  He concluded that Plaintiff would have "difficulty performing most types of physical activities." (*Id.*)

### 4.  Dr. Holbrook

State agency physician Walter Holbrook, M.D., gave a reviewing physician opinion regarding Plaintiff's physical functioning in December 2007.  (R. at 301–08.)  Dr. Holbrook

opined that Plaintiff was capable of occasionally lifting 50 pounds and frequently lifting 25

pounds. (R. at 302.) He concluded Plaintiff was capable of standing and/or walking for 6 hours

in a workday and sitting for 6 hours in a workday. (*Id.*) Although Dr. Holbrook noted Dr.

Grodner's conclusion that Plaintiff would have difficulty performing most types of physical

activities, he noted the non-specific nature of the statement, and concluded that his findings were

not significantly different from the conclusions of Dr. Grodner. (R. at 307.)

### 5.    OSU Heart & Vascular Center

On June 12, 2009, Plaintiff saw Laxmi Mehta, M.D., for a second opinion regarding

chest pain and shortness of breath. (R. at 431-36.) At this time Plaintiff complained of

exertional angina, dyspnea on exertion, and fatigue. (R. at 434.) Later in June 2009, Plaintiff

underwent a cardiac catheterization and an angiography, which showed 65% stenosis in the left

anterior descending artery and 65% in the circumflex area. (R. at 388-95, 426-30.)

Plaintiff received a stress test in July 2007. (R. at 402, 417.) Plaintiff's baseline

echocardiogram results were normal. (*Id.*) When she exercised, she was limited by fatigue.

(*Id.*) During a follow-up appointment in August 2009, Plaintiff reported that her chest pain had

decreased in frequency and was occurring only two or three times a week with exertion. (R. at

409.) Plaintiff reported mild improvement in both her fatigue and shortness of breath, but she

was exhausted after cardiac rehabilitation. (R. at 401–04.) In November 2009, Plaintiff's angina

was stable, but with more frequent episodes. (R. at 399.)

### 6.    Dr. Kemp

Plaintiff saw William Kemp, M.D., a neurosurgeon, in November 2009, for her low

back and leg pain. (R. at 475-76, 477-78.) Dr. Kemp found Plaintiff's 2007 testing to be

unremarkable, but ordered additional testing. (R. at 478.) On November 30, 2009, Dr. Kemp reviewed Plaintiff's MRI results noting some degenerative changes and spinal stenosis. (R. at 475.) Dr. Kemp discussed possible surgical treatment of Plaintiffs spinal stenosis, but noted that Plaintiff did not "feel that the level of her difficulties [was] sufficient to warrant surgical intervention at this time." (*Id.*) She was interested, however, in undergoing epidural steroid injections. (*Id.*) During a December 2009 follow-up, Lisa Choung, M.D., observed that Plaintiff was ambulating independently, had normal strength in her arms and legs, and had normal sensation. (R. at 469.) Plaintiff did have significant tenderness to palpation across her lower thoracic spine. (*Id.*) She had positive facet loading in both the lower thoracic and lumbar spine. (*Id.*) Straight leg test results were negative bilaterally. (*Id.*)

## IV. EXPERT TESTIMONY

### A. Medical Testimony

#### 1. Dr. Hamill

Daniel W. Hamill, Ph.D., testified as an impartial psychological expert at the administrative hearing.[2] From the record, Dr. Hamill found support for a diagnosis of major depressive disorder, single episode. (R. at 30.) Although Dr. Hamill noted anecdotal evidence of anxiety, it was too nonspecific for a formal diagnosis. (*Id.*) Dr. Hamill indicated that Plaintiff's anxiety would not be a medically determinable severe psychological impairment. (R. at 31.) Dr. Hamill opined that Plaintiff's mental impairments did not meet or equal a listing. (*Id.*) Dr. Hamill also testified as to Plaintiff's functional capabilities from a psychological

---

[2] Although Dr. Hamill testified at the hearing, the ALJ excused him prior to Plaintiff's testimony. (R. at 33.)

standpoint.  (R. at 31–32.)  According to Dr. Hamill, Plaintiff should be limited to a low stress environment, consisting of no forced pace or assembly line work; detailed but not complex tasks; and occasional contact with the public.  (R. at 31-32.)

### 2.  Dr. Neiman

Melissa Neiman, M.D., also testified as a medical expert at the administrative hearing. She listed osteoarthritis of the spine, ischemic cardiac heart disease, fibromyalgia, obesity, and hypothyroidism as Plaintiff's severe physical impairments.  (R. at 47–48.)  Dr. Neiman opined that Plaintiff's impairments, either singly or in combination, did not meet or equal any listing. (R. at 48.)  She testified that Plaintiff's functional capacity would be limited to the light exertional level restricted by no heights, ropes, scaffolds, or ladders.  (*Id.*)  Dr. Neiman also found that Plaintiff would not be capable of crawling, crouching, or kneeling.  (*Id.*)   Dr. Neiman further opined that Plaintiff should not work around dangerous machinery or at exposed heights. (R. at 49.)

Dr. Neiman testified that the medical records did not support Plaintiff's allegation of needing to lie down through the day to alleviate her pain.  (R. at 49-50.)  Dr. Neiman stated she based this conclusion on the record, the history, the examination findings, and the MRI results. (R. at 50.)

### B.  Vocational Testimony

Cecile Johnson testified as a vocational expert at the administrative hearing.  She classified Plaintiff's past employment as medical sales and sales analyst, which was light, skilled work.  (R. at 52.)  Ms. Johnson indicated that Plaintiff's past relevant work also included a job as a convention coordinator for medical sales, which she classified as sedentary skilled work.  (*Id.*)

The ALJ asked Ms. Johnson to consider a person of Plaintiff's age, education, and past work experience who was limited to light work. (R. at 53.) The ALJ further detailed that this person could occasionally lift and carry 20 pounds; frequently lift 10 pounds; sit, stand, and walk about six hours in an eight hour workday; and push and pull the same as she could lift and carry. (*Id.*) The ALJ further provided that this person must have an at will sit/stand option. (*Id.*) The ALJ assigned various postural limitations consistent with Dr. Neiman's functional assessment. (*Id.*) Mentally, the ALJ restricted this person to detailed work, with occasional public contact. (*Id.*) He defined occasional as very little up to one-third of the workday. (*Id.*) Finally, this person could not perform forced pace or assembly line work. (*Id.*)

Ms. Johnson concluded that such a person could not perform Plaintiff's past relevant work. (*Id.*) She determined, however, that such a person could perform light clerk jobs, such as administrative clerk with 3,000 jobs in the state economy and over 250,000 nationally; general clerk with 4,500 jobs in the state economy, and over 400,000 nationally; and procurement clerk with 3,000 jobs in the state economy and over 400,000 nationally. (R. at 53-54.) In response to questioning from Plaintiff's attorney, Ms. Johnson indicated that the need to lay down for 45 minutes at a time, two times during a workday, would be work preclusive. (R. at 54-55.) Additionally, Ms. Johnson provided that someone who would be off task more than fifteen percent of the workday would not be able to maintain employment. (R. at 55.) Finally, Ms. Johnson testified that if Plaintiff's testimony was fully credited, her limitations would preclude gainful employment. (R. at 57.)

## V. ADMINISTRATIVE DECISION

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security

Act in his May 6, 2010 decision. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. (R. at 12.) At the first step of the sequential evaluation process,[3] the ALJ found that Plaintiff has not engaged in substantial gainful activity since November 3, 2006, her alleged disability onset date. (*Id.*)

Next, the ALJ found that Plaintiff has the severe impairments of osteoarthritis of the spine; ischemic cardiac disease; fibromyalgia; obesity; hypothyroidism; and major depressive disorder, single episode. (*Id.*) At step three, the ALJ then determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ concluded that Plaintiff had the ability to perform a reduced range of light work. (R. at 15.) The ALJ assigned the following limitations to Plaintiff's ability to perform light work:

> lifting and/or carrying 20 pounds occasionally and 10 pounds frequently (including

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

upward pulling); standing and/or walking for 6 hours in an 8 hour workday (with normal breaks); sitting for 6 hours in an 8 hour workday (with normal breaks); and must have an "at will" sit/stand option. The pushing and/or pulling limits are the same as lifting and/or carrying. Claimant should never crouch, crawl, kneel or climb ladders, ropes or scaffolding. She can frequently balance, stoop, and climb ramps and stairs. There should be no working around exposed heights or dangerous moving machinery.

(*Id.*) From a mental perspective, the ALJ found that Plaintiff could understand, remember, and carry out detailed tasks, but could not perform forced pace or assembly line work, and should have only occasional public contact. (*Id.*) In reaching this determination, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible. (R. at 16.) The ALJ gave no weight to Dr. Salomon's opinion that Plaintiff was unable to concentrate. (R. at 18.) Instead, the ALJ gave greater weight to the opinions of Drs. Neiman and Hamill. (*Id.*)

Based on the assigned RFC, the ALJ determined that Plaintiff could not perform her past work. (R. at 19.) Nevertheless, relying on the testimony of Ms. Johnson, he concluded there were a significant number of jobs in the national economy that Plaintiff could perform. (R. at 19-20.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 20.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there

is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard,

"'a decision of the Commissioner will not be upheld where the SSA fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the claimant of a

substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d

742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

As noted above, Plaintiff maintains that the ALJ erred in a variety of ways.  Plaintiff

asserts that the ALJ erred in weighing the medical opinion evidence.  Additionally, Plaintiff

maintains that the ALJ erred in assessing her credibility and by failing to properly account for

her fibromyalgia.  Plaintiff also faults the ALJ for failing to consider her fatigue and crying

spells.  Finally, Plaintiff contends that the ALJ committed errors in relying on the vocational expert's testimony.

## A.    Medical Opinion Evidence

Within her Statement of Errors, Plaintiff contends that the ALJ made several errors in weighing the medical evidence.  First, Plaintiff contends that the ALJ erred in giving the opinion of her treating physician, Dr. Salomon, no weight.  Additionally, Plaintiff maintains that the ALJ erred in giving greater weight to the medical experts, Drs. Neiman and Hamill, who testified at the administrative hearing.  Lastly, Plaintiff asserts that the ALJ failed to properly consider evidence from Drs. Godner, Clemente, and Mancuso.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2)**.**  The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 404.1527(c).

Certain types of opinions, however, are normally entitled to greater weight.  *Id.*  For example, if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  "On the other hand, a Social Security Ruling explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is

inconsistent the with other substantial evidence in the case record.'" *Blakley*, 581 F.3d at 406 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)).

In weighing the opinion evidence, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Such reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Even assuming a treating physician opinion is not entitled to controlling weight, an ALJ must apply the applicable factors for weighing medical evidence and determine the appropriate amount of weight to give to the opinion. *Blakely*, 581 F.3d at 406; *see also* 20 C.F.R. § 404.1527(c)(2) (listing factors that must be considered including treatment relationship, supportability, and consistency); *but see Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x. 216, 222 (6th Cir. 2010) (indicating that, under *Blakely* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) within the written decision).

Along similar lines, the opinions of treating and examining sources are generally entitled to more weight than opinions of consulting and non-examining sources. 20 C.F.R. § 404.1527(c)(1). The United States Court of Appeals for the Sixth Circuit has held, however, that "'[i]n appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.'" *Blakely*, 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)); *see also Fuston v. Comm'r of Soc. Sec.*, No. 1:11–cv–224, 2012 WL 1413097, at *10 (S.D. Ohio Apr. 23,

2012) ("Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision."). This can occur, for example, when the state agency medical expert has the opportunity to review the complete case record and, therefore, has more comprehensive information than the treating source. *Blakely*, 581 F.3d at 409.

### 1. Dr. Salomon

Plaintiff's first contention is that the ALJ erred in giving no weight to Dr. Salomon's opinion. As Plaintiff's primary care physician, Dr. Salomon diagnosed and treated Plaintiff for her various conditions. Dr. Salomon, however, offered only a single opinion addressing Plaintiff's work ability on a June 2007 form. Dr. Salomon specifically opined that Plaintiff's inability to concentrate well, and tendency to panic, would limit her ability to work. (R. at 231.) The ALJ gave this particular opinion no weight, noting that Dr. Salomon admitted on the form that it was still too early to tell whether Plaintiff would respond to mental health treatment. (R. at 18.) The ALJ indicated that instead of crediting this opinion, he was giving greater weight to the opinions of Drs. Neiman and Hamill because their testimony was consistent with the medical evidence. (*Id.*)

Upon review, the undersigned finds that the ALJ did not err in failing to give weight to Dr. Salomon's June 2007 opinion. First, the ALJ's articulation met the procedural requirements of the good reason rule. In his written decision, the ALJ explained that he was giving Dr. Salomon's opinion no weight. The ALJ indicated the basic reasoning for why he rejected the opinion. In particular, the ALJ highlighted that Dr. Salomon qualified his opinion, acknowledging that he gave it at a time when it was too early to fully assess the impact of

Plaintiff's mental health treatment. The ALJ's opinion also indicated that he was giving contrary medical opinions greater weight, and implied that he found such opinions to be more consistent with the medical record as a whole.[4]

Additionally, substantial evidence supports the ALJ's decision to give Dr. Salomon's opinion no weight. Notably, the ALJ only rejected Dr. Salomon's opinion to the extent it related to Plaintiff's ability to concentrate. Furthermore, Dr. Salomon's opinion is vague as to the severity of Plaintiff's concentration and panic problems, and the way these conditions impact her ability to work. As the ALJ recognized, Dr. Salomon qualified his opinion, recognizing that at the time he completed the form it was still too early to determine Plaintiff's response to treatment. Finally, in giving Dr. Salomon's opinion no weight, the ALJ relied on the opinions of Drs. Neiman and Hamill. These medical experts, based on their review of the entire record, gave a far more detailed account of Plaintiff's mental and physical functional capacity. Neither of these medical experts opined that Plaintiff had work preclusive problems with panic or concentration. Furthermore, following a consultive examination, Dr. Hammerly opined that Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was not impaired. (R. at 240.) Under these circumstances, Dr. Salomon's opinion was not entitled to controlling weight; nor did the ALJ err in ultimately rejecting the opinion.

---

[4] Even assuming the ALJ's articulation fell short of the strict letter of the reason-giving requirement, the written decision explicitly stated the weight the ALJ gave Dr. Salomon's opinions and indicated the basic reasons for this weight. Accordingly, at the very least, the ALJ satisfied the goals of the reason-giving requirement. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (suggesting that an ALJ's failure to comply with the terms of the reason-giving requirement is harmless error if the ALJ meets the goals of the procedural safeguard).

### 2. Drs. Neiman and Hamill

Plaintiff also maintains that the ALJ erred in giving weight to the opinions of the medical experts. As detailed above, both Drs. Neiman and Hamill testified at the administrative hearing regarding Plaintiff's functional capacity. Dr. Hamill opined that, from a mental perspective, Plaintiff could perform detailed, but not complex work, with occasional public contact, and no forced pace or assembly line production. (R. at 32.) Dr. Neiman concluded that Plaintiff was physically capable of performing a reduced range of light work. (R. at 48–49.) The ALJ gave these opinions "greater weight," than the opinion of Dr. Salomon. (R. at 18.) The ALJ stated that he credited these opinions because the medical experts were able to review the entire record, listen to Plaintiff's testimony, and because he found the opinions consistent with the medical record as a whole. (R. at 18.)

Plaintiff first challenges the ALJ's analysis on vagueness grounds. Plaintiff specifically contends that because the ALJ only stated that he was providing the medical experts "greater weight" it is unclear exactly what weight he gave the opinions. This contention is unpersuasive. Reading the ALJ's opinion as a whole, and reading it within the context of the record, it is clear that the ALJ gave the opinions of the medical experts great weight. Tellingly, the ALJ's ultimate RFC assessment generally tracks the opinion testimony of the two medical experts.

Plaintiff also maintains that the ALJ erred because he mistakenly credited the medical experts for listening to Plaintiff's testimony. As Plaintiff stresses, the ALJ's statement that the medical experts "listened to claimant's testimony" is partially incorrect. (R. at 18.) The ALJ excused Dr. Hamill before Plaintiff testified and Dr. Neiman gave her medical opinion after only a portion of Plaintiff's testimony. If this was the ALJ's only reason for favoring the medical

expert opinions, remand might be necessary. As discussed below, however, various reasons support the ALJ's decision to credit these opinions. Accordingly, the undersigned does not find that the ALJ's misstatement constitutes reversible error.

Ultimately, based on the record as a whole, the ALJ was justified in favoring and crediting the opinions the medical experts. As the ALJ recognized, both medical experts gave detailed opinions regarding Plaintiff's functional abilities based on their review of the entire medical record. Notably, although the record contains medical evidence from various treating and examining physicians, none of these physicians gave detailed accounts of Plaintiff's mental or physical functional abilities. Additionally, Dr. Hamill's opinions regarding Plaintiff's mental capacity appear to be consistent with, if not more restrictive than, Dr. Hammerly's opinions with respect to Plaintiff's ability to understand, remember, and follow instructions, and her ability to maintain attention, concentration, and persistence. (*See* R. at 239–40.) Similarly, Dr. Neiman's physical RFC evaluation was actually more restrictive than Dr. Holbrook's assessment of Plaintiff's abilities. (*See* R. at 301–08.) Under these circumstances, and considering the entire record, the ALJ was at least reasonable in giving great weight to the medical expert opinions and finding them consistent with the medical evidence.

### 3. Drs. Grodner, Clemente, and Mancuso

Finally, Plaintiff maintains that the ALJ erred in considering the medical evidence of Drs. Grodner, Clemente, and Mancuso. The undersigned disagrees. Although the ALJ did not explicitly state what weight he gave these doctors, Drs. Clemente and Mancuso did not offer specific opinions regarding Plaintiff's functional capacity. Furthermore, Dr. Grodner was not a treating physicians and, therefore, any of his opinions were not entitled to the procedural

protection of the good-reason requirement. Following a consultive examination, Dr. Grodner opined that Plaintiff would have "difficulty performing most types of physical activities." (R. at 243.) As Defendant notes, this statement does not break down Plaintiff's specific limitations. Regardless, the ALJ ultimately assigned a physical RFC which recognized that Plaintiff would have difficulty with physical tasks. Notably, Dr. Holbrook, who assigned a less restrictive physical RFC than the ALJ, still implied that his RFC assessment was consistent with Dr. Grodner's conclusions. (*See* R. at 307.) Once again, the undersigned finds that the ALJ was reasonable, and within the allowable zone of choice, in weighing the medical evidence.

## B.    Credibility and Fibromyalgia

In addition to challenging the ALJ's consideration of the opinion evidence, Plaintiff asserts that the ALJ erred in considering Plaintiff's credibility. Furthermore, Plaintiff contends that the ALJ failed to properly account for her fibromyalgia.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F.

App'x 469, 475 (6th Cir. 2008). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. Furthermore, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

On a related note, cases involving fibromyalgia "place[] a premium . . . on the assessment of the claimant's credibility." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). This is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486

F.3d at 243. "Nonetheless, a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . ." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (emphasis in original). Accordingly, in cases involving fibromyalgia an ALJ must assess Plaintiff's credibility and "decide . . . if the claimant's pain is so severe as to impose limitations rendering her disabled." *Swain*, 297 F. Supp. 2d at 990.

In this case, the ALJ did not err in assessing Plaintiff's credibility. First, although sometimes truncated, the ALJ's written decision was sufficiently specific to make clear the weight he gave to Plaintiff's testimony and the reasons for that weight. Within his RFC assessment, the ALJ stated that he found Plaintiff's testimony to be not entirely credible to the extent that it was inconsistent with his ultimate RFC assessment. Although the ALJ effectively used boilerplate language for his analysis, it was sufficient to indicate the weight he gave to Plaintiff's testimony. The ALJ next engaged in a review of the medical evidence, portions of which suggested why the ALJ found Plaintiff less than entirely credible. For example, in reviewing the evidence, the ALJ stressed that Plaintiff had suggested to Dr. Kemp that she did not consider her pain severe enough to justify surgery. (R. at 18.) Finally, toward the end of his RFC analysis, the ALJ stated that although the medical evidence indicated Plaintiff would experience some pain and discomfort, the evidence did not suggest that such symptoms would rise to the work preclusive level. (R. at 18.) Additionally, the ALJ explicitly concluded that Plaintiff's testimony regarding her reason for stopping mental health counseling did not hold up to scrutiny. The undersigned finds the above articulation sufficiently specific in conveying the ALJ's reasoning.

Second, substantial evidence supports the ALJ's credibility determination. The objective

medical evidence, in and of itself, does not appear to confirm Plaintiff's testimony to the extent she alleges disabling symptoms.  Furthermore, two medical experts, considered the entire medical record, and accounting for Plaintiff's mental and physical impairments, suggested that Plaintiff had the ability to perform a reduced range of light work.  Other factors, in addition to the objective medical evidence, also suggest that Plaintiff was not entirely credible.  At the hearing, Plaintiff testified that she stopped working due to her depression in 2006 and that the depression had remained the same since that time.[5]  (R. at 36–37.)  As the ALJ recognized, however, Plaintiff admitted she had not attempted to find a new psychologist when her insurance changed during the previous year.  (R. at 46.)  One possible inference from this testimony is that Plaintiff's mental conditions were not as serious as she implied.  With regard to Plaintiff's physical condition, she testified that she suffered from constant back and neck pain which she rated as a seven on a ten-point scale.  (R. at 41–42.)  Dr. Kemp's November 2009 treatment notes reflect, however, that Plaintiff did not find her back difficulties of sufficient severity to warrant any possible surgical intervention.  (R. at 475.)  Finally, although Plaintiff points to other relevant factors that may support a different credibility finding, an ALJ's decision in this area is entitled to deference.  The Court may not to make an independent factual determination as to credibility.  Under these circumstances, even if a different conclusion would have been justified, it was reasonable for the ALJ to conclude that Plaintiff was not entirely credible to the extent her testimony contradicted his RFC determination.

Relatedly, the ALJ did not fail to account for Plaintiff's fibromyalgia.  The medical

---

[5] Plaintiff also indicated that she had anxiety which had become worse since November 2006.  (R. at 39.)

records contain diagnoses of fibromyalgia as well as some tender-point findings upon examination. None of Plaintiff's examining physicians, however, issued opinions as to the severity of Plaintiff's fibromyalgia. Nor did they opine upon how the condition was affecting Plaintiff's ability to work. The ALJ recognized fibromyalgia as a severe impairment and reviewed Plaintiff's testimony regarding fibromyalgia. Relying on the opinion of Dr. Neiman, who considered Plaintiff's fibromyalgia, the ALJ restricted Plaintiff to a reduced range of light work.

Additionally, the undersigned finds that, even considering fibromyalgia, the ALJ's credibility determination was justified. Plaintiff is certainly correct that a lack of objective medical evidence would not be unusual in a case involving fibromyalgia. As detailed above, however, the ALJ had other reasons for finding Plaintiff not entirely credible. In particular, Plaintiff's testimony regarding her mental health treatment gave the ALJ at least some reason to believe that she might be exaggerating her overall symptoms. Perhaps more importantly, Plaintiff testified at the administrative hearing that her fibromyalgia pain was connected to her back pain and that it was hard to distinguish one from the other. (R. at 44.) Once again, substantial evidence supports the ALJ's decision that, despite her fibromyalgia, Plaintiff was not entirely credible and could perform a reduced degree of light work.

## C.      Fatigue and Crying Spells

Plaintiff also maintains that the ALJ failed to account for her fatigue and crying spells. The undersigned disagrees. Although the record contains references to both fatigue and crying spells, the ALJ did not err in accounting for these symptoms. The ALJ acknowledged both symptoms in his review of Plaintiff's testimony. (R. at 15–16.) Furthermore, as these symptoms

were part of the record, and were a product of Plaintiff's various impairments, it is safe to presume that Drs. Hamill and Neiman considered these symptoms in evaluating Plaintiff's overall functional capacity.  Furthermore, contrary to Plaintiff's suggestion, it is not obvious that her fatigue and crying spells limit her to sedentary work.

**D.    Vocational Testimony**

Lastly, Plaintiff contends that the ALJ erred in relying on vocational testimony to find that she could perform a significant number of jobs in the national economy.  In particular, Plaintiff contends that, pursuant to the ALJ's findings, she could not perform the semi-skilled work that the vocational expert identified at the administrative hearing.[6]  Additionally, Plaintiff contends that the ALJ's hypothetical question failed to account for all of her limitations.

Plaintiff's contentions are unavailing.  Plaintiff mistakenly asserts that the ALJ found her capable of only unskilled work.  To support her argument, Plaintiff relies on a passing reference in the ALJ's decision, stating that he relied on the vocational expert, "[t]o determine the extent to which these limitations erode the *unskilled* light occupational base . . . ."  (R. at 20 (emphasis added).)  As Defendant notes, however, the rest of the decision makes clear that the ALJ's reference to unskilled work was inadvertent.  Specifically, a fair reading of the ALJ's opinion indicates that the ALJ found Plaintiff capable of understanding, remembering, and carrying out detailed instructions.  (R. at 15.)  The vocational expert concluded that such a person could perform a number of semi-skilled jobs.  The ALJ was entitled to rely on this testimony in

---

[6]  In response to the ALJ's hypothetical question, the vocational expert provided a number of semi-skilled jobs that the hypothetical person would be able to perform.  (R. at 54.) The ALJ relied on this testimony in concluding Plaintiff could perform a significant number of jobs.

reaching his final decision.

Finally, the undersigned finds no error in the ALJ's hypothetical question. "Hypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011). The ALJ's hypothetical question tracked the functional opinions of the medical experts, and incorporated the limitations these experts assigned. For the reasons discussed elsewhere in this opinion, the ALJ was entitled to rely on these opinions. Under these circumstances, the ALJ did not improperly omit limitations from his hypothetical question.

## VIII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## IX. NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:   June 29, 2012                              /s/ *Elizabeth A. Preston Deavers*
                                        Elizabeth A. Preston Deavers
                                        United States Magistrate Judge